CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**MAR 3 0 2011**

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DaVON BELL, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 7:09-cv-214 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| OCTAVIA L. JOHNSON, et. al., | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendants. | ) |

Plaintiff DaVon Bell ("Bell") filed this suit on June 1, 2009 against Sheriff Octavia

Johnson ("Sheriff Johnson" or "Johnson") and several deputies (the "deputy defendants")

employed at the Roanoke City Jail (the "Jail"), claiming that he was subjected to

unconstitutionally excessive force during his detention there in September of 2008. By

memorandum opinion dated December 23, 2009, the court dismissed Bell's claims against the

defendants in their official capacities as barred by sovereign immunity. The case is now before

the court on motions for summary judgment filed by each of the defendants with respect to the

claims remaining against them.

## I.   Factual Background

The following facts are stated in the light most favorable to the plaintiff, the non-moving

party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

At approximately 6:00 a.m. on September 14, 2008, DaVon Bell and a friend, Jacob

Stewart, were arrested by a Roanoke City Police Officer and taken to the Roanoke City Jail to be

booked on charges of grand larceny.[1] Beginning at about 7:16 a.m., Bell and Stewart were

---

[1] There is no dispute regarding the validity of the initial arrest.

processed into the Jail. As part of that process, Bell was permitted to make several telephone calls from the intake counter at the Jail.

At approximately 8:40 a.m., Bell and Deputy Robert Baker ("Baker") had a disagreement about Bell's continued use of the telephone. Baker informed Bell that he would have to move out of the intake area and gestured him toward the doorway. Bell turned away from Baker and began to move toward the doorway as directed, complaining as he did so, "What the f—, man?" Baker immediately lunged forward, grasped Bell by the shoulder and the back of his neck, and wrestled him to the ground.

At this point, Deputy Brandon Young ("Young"), who was behind the counter in the intake area, looked up and saw the altercation in the doorway. Young ran toward both men and began delivering several punches and knee strikes to Bell's lower back as he fell to the ground, with Baker putting weight on Bell's upper torso and head. Young then twisted Bell's left arm into a lockout position, at which point Bell experienced significant pain and heard a popping noise. Bell's friend, Stewart, was standing nearby and witnessed the deputies yelling at Bell to stop resisting. Stewart also heard Bell crying out that he was not resisting and screaming, "My arm!" multiple times. (Pl. Ex. C at ¶ 3.) Deputy Shannon Stroop ("Stroop") also arrived on the scene, observed Young struggling to get control of Bell's right arm, and grasped Bell's right arm and his feet. The deputies placed Bell in handcuffs and then deposited him in a cell.

Stroop, Sergeant Richard Lawson ("Lawson"), and Deputy Leonard Kline ("Kline") entered Bell's cell a few minutes after the take-down incident to remove the handcuffs. After removing one cuff, the deputies ordered him to put his left arm above his head to facilitate the process. Bell could not do so, given the pain in his left arm. Nevertheless, Bell did not inform the

deputies that he was in pain or that he was unable to comply with their instructions. One of the deputies then jerked Bell's left arm above his head, at which point Bell heard another popping noise from his left elbow. The officers removed his remaining cuff and then left the cell.

Bell received medical attention and pain medication while in the Jail, but was told that his arm was not broken. He was released on September 16, 2008. A subsequent physician's visit confirmed that his left elbow had been fractured and required surgical repair.

On September 18, 2008, Bell returned to the Jail and filed a complaint against the deputies involved in the take-down incident. Major David Bell ("Major Bell") was at that time the Lieutenant in charge of the Jail's Professional Standards Unit (the "Unit"), and he immediately commenced an internal investigation into Bell's complaint. After interviewing Bell, Major Bell retrieved video recordings from security cameras positioned at various places in the Jail. Given Bell's movement between various parts of the Jail on the morning of September 14, Major Bell pieced together video footage from different cameras in order to compile an unbroken sequence of video footage regarding Bell's conduct and experiences that morning.[2]

Unfortunately, there is a gap in Major Bell's compilation of video footage. The footage taken by the camera pointing at the intake counter (the "ch03" camera) includes both audio and video and shows the disagreement between Bell and Baker. It also shows Baker's initial grasp of Bell's neck and his propulsion of Bell toward the floor in the doorway. Both men passed out of the camera's range of view at approximately 8:41:33:921 a.m. (Johnson Br. Ex. H at [ch03]091408_081943). No footage from the ch03 camera beyond this moment was preserved by

---

[2] Given that no camera was pointed at the interior of Bell's cell, the footage relating to the handcuff removal incident is limited to a view of the deputies entering and exiting his cell and does not capture any of the events occurring inside.

Major Bell. The next sequential piece of footage preserved during the investigation is from a different camera (the "ch05" camera) pointed at the area on the other side of the intake doorway, toward which Baker was pushing Bell. This camera, however, did not record audio, and the videotape does not provide an unobstructed view of the altercation until about 8:41:36—leaving an approximately two-second gap in coverage. (Johnson Ex. H at [ch05]091408_084133.) At that point, Bell was already collapsing to the floor with Baker on top of him, while Young was already on scene, administering blows to Bell. Nevertheless, the period of time during which Bell's left arm was twisted—and perhaps broken—was captured by the ch05 camera, albeit from a distance.

Major Bell's investigation resulted in a finding that Baker had used excessive force against Bell but that each of the other deputies had acted appropriately under the circumstances known to them at the time of their conduct. Sheriff Johnson adopted these findings. Specifically, Johnson concluded that Young and Stroop had used reasonable force, given that they became involved only after observing Baker struggling with Bell. Johnson also determined that Bell's representations of how the handcuffs were removed were consistent with the deputies' reports and with the standard protocol governing handcuff removal at the Jail. As a result of these findings, Baker was issued a suspension.[3] None of the deputies were required to attend additional training as a result of this incident.

Bell subsequently filed this case on June 1, 2009 against Johnson, Young, Baker, Stroop, Lawson, and Kline (collectively, the "defendants"), asserting (1) that the defendants are liable

---

[3] This suspension was never served by Baker due to the fact that he filed a grievance challenging it and was terminated for unrelated reasons prior to the resolution of the grievance proceedings.

under 42 U.S.C. § 1983 for the use of unconstitutionally excessive force against Bell; (2) that the defendants conspired to violate his civil rights in violation of 42 U.S.C. § 1983; and (3) that the defendants assaulted and battered Bell in violation of state law. On December 23, 2009, the court dismissed each of Bell's claims against Johnson and her deputies in their official capacities. The court's opinion left intact his claims against Johnson and each deputy in their individual capacities. After engaging in discovery, each of the named defendants moved on November 10, 2010, for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.    Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To forestall summary judgment, the nonmoving party must set forth more than a "mere . . . scintilla of evidence." Anderson, 477 U.S. at 252. At the very

least, the nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)). See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (party opposing summary judgment must do more than show that there is some "metaphysical doubt" as to the material facts).

III.   **Section 1983 Claims**

    A.   **Supervisory Liability Claim Against Sheriff Johnson**

    The court heard arguments on the defendants' motions on December 3, 2010, but deferred ruling on the motions in light of Bell's subsequent motion to compel certain discovery from Johnson relevant to Bell's § 1983 supervisory liability claim against her. All parties have indicated that the pertinent discovery has now been provided, but Bell has also filed a motion for sanctions against Johnson, in which he claims that she improperly stonewalled his discovery efforts and thereby prejudiced his case. He requests the court to impose sanctions which include striking her motion for summary judgment or taking judicial notice of certain facts which would establish her liability. Bell's motion has been referred to a United States Magistrate Judge for consideration and presentation to the court of a recommended disposition. Accordingly, to the extent that Johnson's motion for summary judgment challenges the § 1983 supervisory liability claim levied against her, it will be taken under advisement pending disposition of Bell's motion for sanctions. For the reasons stated below, however, the remaining claims against Johnson will be dismissed.

**B.**     **Section 1983 Excessive Force Claims Against the Deputy Defendants**

With respect to Bell's § 1983 excessive force claims, the defendants each assert the defense of qualified immunity, which shields government officials from liability for civil damages unless (1) the evidence establishes the violation of a constitutional right, and (2) the right at issue was clearly established at the time of the alleged misconduct. Doe v. South Carolina Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). See also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The court's analysis of these two prongs need not be sequenced in this order. Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

      1.     Legal Standard

As a pretrial detainee, Bell's excessive force claim is governed by the Fourteenth Amendment. Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008). To succeed on a claim of excessive force under the Due Process Clause of the Fourteenth Amendment, Bell must "satisfy the same legal standards that a sentenced prisoner must satisfy under the Eighth Amendment." Simms v. Bruce, 104 F. App'x 853, 857 (4th Cir. 2004) (per curiam).

Although "[a]n express intent to inflict unnecessary pain is not required" to make out such a claim, Whitley v. Albers, 475 U.S. 312, 319 (1986), Bell must show that the defendants "inflicted unnecessary and wanton pain and suffering." Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998), abrogated on other grounds by Wilkins v. Gaddy, 130 S. Ct. 1175, 1179 (2010) (per curiam). This determination necessarily involves a subjective analysis. See Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (noting that the plaintiff must show "that the correctional officers acted with a sufficiently culpable state of mind."). Factors relevant to this determination are "the need for the application of force, the relationship between the need and

the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." Orem, 523 F.3d at 446. In large measure, the question whether the measure taken inflicted unnecessary and wanton pain and suffering "ultimately turns" on the last of these factors. Whitley, 475 U.S. at 320-21. See also Wilkins, 130 S. Ct. at 1178-79 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

Nevertheless, the court must recognize that "agents of the state are permitted to exercise a certain degree of force in order to protect the interests of society." Justice v. Dennis, 834 F.2d 380, 382 (4th Cir. 1987). Thus, not every "push or shove, even if it may later seem unnecessary" is serious enough to rise to the level of a constitutional violation. Orem, 523 F.3d at 447 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Consequently, the court "must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise, 'we would give encouragement to insubordination in an environment which is already volatile enough.'" Scarbro v. New Hanover County, 374 F. App'x 366, 370 (4th Cir. 2010) (unpublished) (quoting Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999)).

Furthermore, the doctrine of qualified immunity shields government officials from civil damages even where they have violated a plaintiff's constitutional right unless the right that was violated was clearly established at the time of the incident. See Cloaninger v. McDevitt, 555 F.3d 324, 330-31 (4th Cir. 2009). For the plaintiff to defeat qualified immunity, the right that the officer is alleged to have violated must have been clearly established in a

particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987). The law does not expect an officer "to sort out conflicting decisions or to resolve subtle or open issues." Campbell v. Galloway, 483 F.3d 258, 271 (4th Cir. 2007). Accordingly, officers are liable only for "transgressing bright lines" rather than for "bad guesses in gray areas." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). See also Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000).

      2.    Take-down Incident in the Intake Area

The first incident giving rise to Bell's excessive force claims occurred in the intake area and involves three defendants: Baker, Young, and Stroop. The court agrees with Bell that he has raised a genuine issue of material fact regarding whether Baker and Young used unconstitutionally excessive force against him in the intake area, but deems that Bell has not made the requisite showing with respect to Stroop.

As the video recording shows, Baker hung up the telephone that Bell was using and informed him that he would have to relocate to another area of the Jail. Although Bell complained about Baker's request ("What the f—, man?"), the video shows that Bell had actually begun walking in the appropriate direction—away from Baker—when Baker stepped forward, grabbed him forcefully by the back of the neck, and wrestled him to the ground. Baker claims that he thought Bell said something to the effect of "I'm going to f— you up," and that he felt threatened by Bell's body language, but a reasonable jury reviewing the video footage could find otherwise. See Orem, 523 F.3d at 446.

9

Bell has similarly forecasted evidence sufficient for a jury to find that Young used unconstitutionally excessive force against him. According to Young, he heard Bell become belligerent, looked up to see him struggling with Baker, ran to assist his fellow deputy in restraining Bell, and struck Bell only until he was compliant on the ground. Bell, however, has maintained that he was not resisting Baker at any point in the altercation, and Baker has likewise asserted that he had Bell entirely under control before Young arrived on the scene. See Baker Dep. at 97.

Of course, "where . . . the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008). But with respect to Young, Baker has testified that the video footage preserved in the subsequent investigation does not actually capture all of the events in question. The preserved video footage partially bears this claim out. Significantly, due to the two-second gap in coverage, the video footage does not reveal whether or to what extent Bell was struggling at the moment that Young engaged the pair and began administering strikes to Bell's torso. Baker's version of the interim events is that, while Bell was under his control and not resisting the take-down, Young administered several blows to Bell in that interval that were not captured on film. Thus, because "the video fails to capture [several] important seconds of the incident, about which the parties' accounts decidedly differ," it cannot suffice to squelch Bell's—or Baker's—version of the facts of its own accord. Witt v. West Virginia State Police, ___ F.3d ___, 2011 WL 338792, at *5 (4th Cir. Feb. 4, 2011) (slip op.).

Baker has also claimed that the portion of Young's conduct that was captured on film—the arm-strikes, knee-strikes, and lockout of Bell's left arm—involved unnecessary force because Bell had already been subdued by Baker prior to Young's use of these measures against him. (Baker Dep. at 27.) Moreover, Baker has cast doubt upon Young's motivation for commanding Bell to stop resisting, because, according to Baker, Young "always tells the inmate to stop resisting when he is punching them" in order to justify the force he inflicts upon them. (Baker Dep. at 28.) Bell has also insisted that he never resisted Young's efforts to subdue him or to grasp his arms—and, given the "soundless video" and obstructed, long-range view captured by the ch05 camera, it is "difficult to decipher from reviewing the video the true sequence of events." Witt, ___ F.3d ___, 2011 WL 338792, at *4.

Together, this evidence counsels against finding, as a matter of law, that Young did not exercise constitutionally excessive force against Bell. Not only has Bell made a showing that Young had little or no need to apply force against him, but he has also called into question Young's motivation for applying the particular degree of force that was used—and that ultimately resulted in Bell suffering a broken arm. See Orem, 523 F.3d at 446. Even though "the reasonableness of [a law enforcement officer's] response must be gauged against the reasonableness of [his] perceptions, not against what may later be found to have actually taken place," Gooden v. Howard County, Md., 954 F.2d 960, 965 (4th Cir. 1992) (en banc), a reasonable jury could find on the basis of this evidence that the force applied by Young was not applied "in a good faith effort to maintain and restore discipline." Orem, 523 F.3d at 446.

The same cannot be said about Stroop's involvement in the intake area incident. With respect to Stroop, all of the evidence shows that he came on the scene only in response to a call

for assistance, arriving while both Baker and Young were grappling with Bell on the ground. Stroop maintains—and Bell has produced no evidence to dispute it—that, upon his arrival, Young was yelling at Bell to stop resisting as he wrestled for Bell's right arm and that Bell was moving his legs as he lay on the ground. Stroop therefore claims that he believed that his conduct in grasping Bell's feet and right arm was necessary to assist his fellow-officers in subduing a resisting inmate. See Gooden, 954 F.2d at 965. Not only were Bell's feet and right arm uninjured, but Stroop also ceased applying pressure to Bell as soon as Bell stopped resisting. See Wilson v. Flynn, 429 F.3d 465, 468-69 (4th Cir. 2005) (noting, in the context of a Fourth Amendment excessive force claim, that this circumstance suggests a reasonable use of force). Unlike with respect to Young, Bell has been able to forecast no evidence suggesting that Stroop was acting for any purpose other than to assist his fellow officers in restraining an unruly inmate. See Stanley, 134 F.3d at 634; Grayson, 195 F.3d at 697. Accordingly, Bell has not sufficiently demonstrated that he suffered a constitutional deprivation at the hands of Stroop. See Orem, 523 F.3d at 446.

Nor can Stroop's conduct subject him to bystander liability with respect to this incident. A law enforcement officer may incur bystander liability under § 1983 if he (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. See Randall v. Prince George's County, Md., 302 F.3d 188, 204 (4th Cir. 2002); Smith v. Mensinger, 293 F.3d 641, 650-52 (3d Cir. 2002). But, given Stroop's ignorance of the events leading to the struggle, the fact that he heard Young give repeated verbal commands to Bell to stop resisting, and the lack of evidence to dispute Stroop's perception that Bell continued moving his legs and arms contrary to Young's orders, Stroop

cannot have known that Baker and Young were violating Bell's constitutional rights, even if they were. As a consequence, his failure to intervene against either Young or Baker cannot result in bystander liability under § 1983. See Randall, 302 F.3d at 204.

Regardless, Stroop is entitled to qualified immunity with respect to his conduct, given that no reasonable deputy would have known that it violated an inmate's constitutional rights to grasp his foot and arm in order to assist his fellow deputies in restraining him as he writhed on the ground. See Henderson, 223 F.3d at 273; Maciariello, 973 F.2d at 298. Bell has identified no decisional law to the contrary. In fact, the evidence suggests that the force that Stroop employed was consistent with the training he had received. See Stroop Br. Ex. A ("We are taught that when an inmate presents a threat, we are to take the inmates to the ground, and lay them on their stomach with their arms behind them.").

Neither Baker nor Young, on the other hand, are entitled to qualified immunity on the excessive force claims against them. While the court recognizes the deference due to law enforcement officers working in the tense and often volatile jailhouse environment, see Grayson, 195 F.3d at 697, the evidence—viewed in the light most favorable to Bell—suggests that Bell was actually compliant at the moment that Baker seized him and wrestled him to the ground. Baker has also maintained that Young administered blows to Bell while Bell was subdued and non-resistant and that Young's actions were entirely unnecessary. The video footage does not conclusively demonstrate otherwise. See Witt, ___ F.3d ___, 2011 WL 338792, at *5. The court cannot engage in a credibility determination on summary judgment, see Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992), and it must therefore conclude that both Baker and Young, if found to have wantonly administered significant force on an unresisting inmate, are not entitled

to qualified immunity with respect to their conduct. See id. (noting that an officer's alleged assault of an unresisting pretrial detainee "could not, by any reasonable officer, be considered to be within the bounds of the law").[4]

### 3. Handcuff Removal Incident

Bell also claims that each of the deputies involved in the removal of his handcuffs (i.e., Lawson, Kline, and Stroop) are liable for an excessive use of force. Although Bell cannot point to any single officer as the one who jerked his arm above his head, he argues that they are each liable for their failure to stop the perpetrator from violating Bell's constitutional rights. As explained previously, a law enforcement officer incurs bystander liability under § 1983 if he knows that a fellow officer is violating an individual's constitutional rights, has a reasonable opportunity to prevent the harm, but nevertheless chooses not to act. See Randall, 302 F.3d at 188.

Bell essentially argues that the officers each knew that Bell's Fourteenth Amendment right against excessive force was violated when his arm was jerked above his head after he was unable to do so himself. Bell primarily points to the fact that the officers each documented the removal of Bell's handcuffs by noting that it occurred without incident. Bell claims that handcuff removal was typically not documented in such reports. The fact that the deputies went out of

---

[4] Even if Baker and Young could argue that they are entitled to qualified immunity because they were not on notice of the heightened standard recently announced in Wilkins, 130 S. Ct. at 1178-79, but were instead operating under the "de minimis injury" scheme adopted by the Fourth Circuit in Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994) (en banc), their argument must still fail. A broken arm is not de minimis injury. Cf. Norman, 25 F.3d at 1263-64. Moreover, the pre-Wilkins Fourth Circuit consistently disapproved of the wanton use of force against an unresisting inmate, regardless of the amount of injury suffered. Riley v. Dorton, 93 F.3d 113, 117-18 (4th Cir. 1996); Rainey, 973 F.2d at 324. As a result, the court cannot conclude that Baker and Young were not on notice that their alleged conduct toward Bell violated a clearly-established constitutional right, despite the fact that Wilkins had not yet been handed down by the Supreme Court. Cloaninger, 555 F.3d at 330-31.

their way to document the fact that they removed Bell's handcuffs without incident means, according to Bell, that they knew that the force they used was excessive and that they were attempting to paper over their wrongdoing by creating contemporaneous exculpatory documentation.

The defendants counter, however, that it is Jail policy not to leave inmates in a cell with handcuffs on for a significant amount of time. As a result, it is routine procedure for deputies to file an incident report when they remove the handcuffs of a prisoner who had previously been resistant in order to document that the handcuffs had in fact been removed. See Johnson Dep. at 169-70; Lawson Dep. at 70. More to the point, the handcuff removal procedure documented by the deputies was consistent with established protocol, which required an inmate to stand with his back to the cell door while the handcuffs were removed, one hand at a time. After the cuffs were removed from the first hand, the protocol required the inmate to place that hand on his head, after which the deputy would remove the cuffs from the other hand and place that hand on the inmate's head before leaving the cell.

As Bell has himself admitted, the removal of his handcuffs followed this protocol. (Bell Dep. at 113.) After Bell's left hand was removed from the cuffs, he moved it "slowly" towards his head because he was in pain. See Bell Dep. at 189. Given that the deputies would clearly be justified in using some measure of force to place his hand atop his head if they perceived him to be merely malingering, see Gooden, 954 F.2d at 965, Bell essentially argues that the deputies should have deviated from the standard protocol to accommodate the injury to his left arm. But Bell has also admitted that he at no time before the handcuff removal incident told any of the deputies that his arm was injured. See Bell Dep. at 217, 293; id. at 194-96, 263-66. Nor is there

15

any reason that they should have known. Certainly, Stroop, who had been involved in the initial altercation near the intake area, may have previously heard Bell yelling about his arm. But there is no evidence that Stroop ever heard Bell's arm make a popping noise, that Bell's arm was visibly injured at the time his handcuffs were removed, or that Stroop had any pretension to the advanced medical knowledge necessary to make an extrapolation of serious injury merely from Bell's previous protests of pain. And, while Bell may have shed tears during the incident, Bell has not disputed the defendants' assertion that they were not put on notice by such conduct because many detainees are emotionally overwrought in the hours surrounding their initial detention.

At best, the deputies who removed Bell's handcuffs knew only that he had experienced temporary pain when Young applied a routine restraint hold to his left arm; they had no reason to know that his arm had in fact been seriously injured. Because jerking Bell's arm to conform with the uncuffing protocol when he appeared to be non-compliant cannot constitute wanton or malicious behavior giving rise to an excessive force claim under the Fourteenth Amendment, summary judgment must be granted to the defendants with respect to the claims arising out of this incident. See Orem, 523 F.3d at 447; Grayson, 195 F.3d at 697.

**C.     Section 1983 Conspiracy Claims**

Bell also claims that the defendants are liable under § 1983 for conspiring to violate his constitutional rights. To establish a civil conspiracy under § 1983, Bell "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416, 421 (4th Cir. 1996). While Bell need not produce direct

evidence of a meeting of the minds, he must still "come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Id. "In other words, to survive a properly supported summary judgment motion, [Bell's] evidence must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Id.

Bell asserts not only that the deputies involved in each of the discrete use of force incidents—i.e., the intake area incident and the handcuff removal incident—conspired to use excessive force against Bell, but also that Johnson and all of the deputies conspired to create a sham investigation by falsifying incident reports and selectively editing the video recordings. Bell's conspiracy claim against the deputies who removed his handcuffs is foiled at the outset, however, since he has failed to establish an underlying constitutional deprivation. See Hinkle, 81 F.3d at 421; Washington v. Buraker, 322 F. Supp. 2d 702, 715 (W.D. Va. 2004) (Moon, J.).

With respect to the incident in the intake area, Bell has failed to forecast "specific circumstantial evidence" of an agreement between any of the purported co-conspirators to maliciously inflict wanton injury upon him. Hinkle, 81 F.3d at 421. Instead, the undisputed evidence shows that the incident escalated spontaneously inasmuch as each of the deputies became involved without the others' prior knowledge. Baker instigated the initial altercation with Bell without the knowledge of Young, who entered the fray only after he observed the incident mid-progress. Stroop likewise responded to the incident only after receiving a call for assistance and observing his fellow deputies mid-sprawl. Although "[a]cquiescence can amount to a conspiracy agreement when . . . one police officer watches an open breach of the law and does nothing to seek its prevention," Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1992), there is, as

explained above, no reason to believe that any of the deputies knew that any of their colleagues were patently violating Bell's constitutional rights.

Finally, Bell has been able to forecast no evidence suggesting that Johnson or any of the deputies agreed even tacitly to engage in any cover-up that would deprive Bell of a constitutional right. See Hinkle, 81 F.3d at 421. Bell first argues that the deputies and Johnson conspired to engage in an after-the-fact cover-up of the deputies' use of unconstitutionally excessive force against Bell by falsifying incident reports, selectively editing the relevant video footage, and denying Baker insurance coverage from the Division of Risk Management, which has financed the defense of each of the other defendants in this case.

There are two problems with this argument. First, there is no indication that any of the allegedly whitewashing conduct was directed at depriving Bell of a constitutional right. See Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980) (observing that a conspiracy claim is actionable under § 1983 only to the extent that there is "besides the agreement, an actual deprivation of a right secured by the Constitution and laws."). Although Bell obviously has a constitutional right to be free from excessive force, Bell has made no argument that the defendants' alleged cover-up embraced any such constitutional deprivation as its object. Unfortunately for Bell, the mere allegation that the deputies colluded to misrepresent their prior (mis)conduct toward Bell does not necessarily give rise to a constitutional deprivation. See Green v. New Jersey State Police, 2006 WL 2289528 at *4 (D. N.J. Aug. 9, 2006) (unpublished) ("In this case, Green fails to identify or put forth any evidence establishing how either the omission of certain facts from Schusler's report or the officers' lies caused him any constitutional injury. While such actions, if true, constitute improper police conduct, the mere fact that the officers

may have escaped discipline does not injure Green's constitutional rights."); Bush v. City of Philadelphia, 1999 WL 554585 at *4-6 (E.D. Pa. July 16, 1999) (collecting cases). See also Landrigan, 628 F.2d at 745 ("[T]he mere filing of the false police reports, by themselves and without more, [does] not create a right of action in damages.").

While there is some support for the theory that an ex post cover-up of a prior constitutional deprivation could contemplate depriving a plaintiff of his constitutional right to seek legal redress for his injury, Bell has made no such argument.[5] Cf. Vasquez v. Hernandez, 60 F.3d 325, 329 (7th Cir. 1995); Landrigan, 628 F.2d at 742; Comfort v. Town of Pittsfield, 924 F. Supp. 1219, 1229 (D. Me. 1996). Of course, while the decision not to provide insurance coverage to Baker may "harm" Bell inasmuch as he could obtain a worthless verdict against Baker, this allegedly-contemplated[6] harm is pecuniary, not constitutional. It therefore cannot support a § 1983 conspiracy claim. Landrigan, 628 F.2d at 745.

Second, there is no evidence that any of the particular defendants agreed to participate in such a conspiracy. Bell points primarily to discrepancies between the deputies' incident reports and the video footage as well as the somewhat ad hoc nature of the documentation surrounding the investigation as circumstantial evidence supporting a mutual understanding to cover-up the deputies' wrongdoing. Bell also claims that the video footage of the intake area incident was doctored by Major Bell in such a manner as to remove inculpatory audio and video footage of

---

[5] Nor is it clear, given the discovery that Bell has received, that he suffered any such injury. See Landrigan, 628 F.2d at 742 ("[P]laintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere proof of a conspiracy is insufficient to establish a section 1983 claim.") (citation omitted).

[6] After receiving additional discovery on this issue in response to his fourth motion to compel, Bell appears to have sidelined his theory positing the defendants' involvement in the Division of Risk Management's coverage decisions. Compare Docket Nos. 146 and 191.

Young, relying heavily on a statement to this effect by Baker.[7] But none of this evidence demonstrates an actual agreement or even a tacit mutual understanding between each of the individual defendants. See Hinkle, 81 F.3d at 421. Even at its best, Bell's evidence points to only independent improprieties rather than to "any communication between [the defendants] that might give rise to an inference of an agreement to commit any acts, wrongful, or otherwise." Id. at 422. See also id. at 416 (noting that it was insufficient for the plaintiff to "offer no evidence, other than the act itself, that [the defendant officer] intended to further a conspiratorial objective."). The court is therefore constrained to conclude that, despite the extensive discovery in which Bell has engaged, he has failed to unearth "facts which show that the defendants shared a 'unity of purpose or common design' to injure the plaintiff." Brown v. Angelone, 938 F. Supp. 340, 346 (W.D. Va. 1996) (Turk, J.). Of course, without the requisite meeting of the minds, "the independent acts of two or more wrongdoers do not amount to a conspiracy." Id.

Bell attempts to evade these infirmities by positing that the defendants conspiratorially established an institutional culture designed to facilitate and encourage excessive use of force by trivializing inmate complaints and conducting sham investigations into allegations of abuse. Under this theory, Bell argues that the Jail-wide conspiracy caused the particular constitutional deprivation suffered by him; namely, the allegedly excessive force he suffered at the hands of the deputies. But at this juncture, Bell's evidence is simply insufficient, reciting only the defendants' long mutual work history and the alleged cover-up of the Bell incident. (Pl. Br. at 54-55.)

---

[7] Baker has subsequently asserted that the video recording released by Major Bell in this matter is the intact original video that contained all of the conduct of all of the officers. See Baker Br. at 8; Docket No. 111-10. Baker has also admitted that he has no knowledge that any of the individual deputies participated in any cover-up. See Baker Dep. at 68, 89, 96-106, 143. Major Bell was not named as a defendant in this action.

Although Bell has dredged up a number of excessive force complaints from other Jail inmates at other times involving the defendants and other deputies, he has failed to establish by specific circumstantial evidence that any of the defendants named in this action agreed with each other—either prior to the incident involving Bell or afterwards—to facilitate a pattern of violent inmate abuse at the Jail. See Hinkle, 81 F.3d at 421.

Whether the excessive force complaints and attendant investigative reports create a triable issue on Bell's supervisory liability claim against Johnson may be another matter. For present purposes, though, it is evident that Bell's attempts at demonstrating any sort of conspiratorial collusion between the defendants depend merely upon "speculation or the building of one inference upon another." Beale, 769 F.2d at 214. Because he has failed to discharge his "weighty burden" in establishing a civil rights conspiracy under § 1983, summary judgment is appropriate on each of these claims. Hinkle, 81 F.3d at 421.

## IV.    State Law Assault and Battery Claims

The common law assault and battery claims levied by Bell against the defendants are governed by Virginia state law. See Gray-Hopkins v. Prince George's County, Md., 309 F.3d 224, 232 (4th Cir. 2002). "The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." Koffman v. Garnett, 574 S.E.2d 258, 261 (Va. 2003) (citations omitted). An assault under Virginia law is "an intentional offer to touch the person of another that created in the mind of the victim a reasonable apprehension of an immediate battery." Id. (citing Epps v. Commonwealth, 502 S.E.2d 140 (Va. App. 1998).

A law enforcement officer enjoys "special protection" from tort liability when he is performing his duties in a lawful manner: "[A]s an officer, he has an affirmative duty to perform,

and in the performance thereof he should, so long as he keeps within due bounds, be protected."

Mercer v. Commonwealth, 142 S.E. 369, 372 (Va. 1928). See also Parker v. McCoy, 188 S.E.2d 222, 226 (Va. 1972) ("[I]n making an arrest under lawful authority, . . . (a police) officer is within reasonable limits the judge of the force necessary under the circumstances, and he cannot be found guilty of any wrong, unless he arbitrarily abuses the power conferred upon him.") (quotation omitted). Thus, either an assault or battery is permitted when justified in the performance of a law enforcement officer's duties. See Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009) ("Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties."); McLenagan v. Karnes, 27 F.3d 1002, 1009 (4th Cir. 1994). Consequently, to succeed on assault and battery claims against a law enforcement officer, a plaintiff must prove "a wrongful act"; that is, that the law enforcement officer's conduct lacked "justification or excuse." Id. If, on the other hand, reasonable force is used by a law enforcement officer in execution of her lawful duty, she is immune from suit for such acts. See Ware v. James City County, Virginia, 652 F. Supp. 2d 693, 712 (E.D. Va. 2009) (citing Pike v. Eubank, 90 S.E.2d 821 (Va. 1956)).

The fact that several of the deputies have evaded liability for excessive force under the Fourteenth Amendment does not insulate them from liability under the pending state law claims, given that a law enforcement officer's conduct need not necessarily be reasonable for him to avoid liability on a Fourteenth Amendment excessive force claim. See Taylor, 155 F.3d at 483 (emphasizing the subjective element of such a claim); see also Young v. Prince George's County, Md., 355 F.3d 751, 758-59 (4th Cir. 2004) (same). Nevertheless, the court concludes that Bell has also failed to adequately forecast evidence sufficient to show that the conduct of Stroop,

Lawson, and Kline was unreasonable. Stroop's conduct in holding Bell's legs and right arm during the incident in the intake area was objectively reasonable in light of his perception that Bell was struggling with Baker and Young. Each of the officers involved in the removal of Bell's handcuffs also acted reasonably, given that they had no reason to believe that Bell's arm was seriously injured and that they simply acted pursuant to the applicable Jail protocol regarding the removal of handcuffs from an inmate who had just been involved in a physical altercation with Jail personnel. See Graham v. Connor, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (in determining the reasonableness of an officer's conduct, "[t]he court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection."). They are therefore entitled to summary judgment on the state law claims against them.

On the other hand, for the reasons stated above, Bell has demonstrated evidence sufficient for a jury to conclude that the conduct of Baker and Young during the incident in the intake area was objectively unreasonable. See Smith v. Mattox, 127 F.3d 1416, 1420 (11th Cir. 1997) (holding it "obviously unnecessary" for an officer to break, with a grunt and a blow, the arm of an unresisting arrestee); Gnadt v. Commonwealth, 497 S.E.2d 887, 888 (Va. App. 1998) ("[A]n arrest utilizing excessive force is a battery because that touching is not justified or excused and therefore is unlawful."). The state law claims against them must therefore go forward.

Finally, the court has carefully considered each of the state law claims brought by Bell against Johnson. Mindful of its obligation to construe the evidence in the light most favorable to

Bell, see Shaw, 13 F.3d at 791, the court nevertheless concludes that Johnson is entitled to summary judgment on each of these claims.

## V.    Conclusion

For the foregoing reasons, the motions for summary judgment filed by Baker and by Young will be denied in part and granted in part. Johnson's motion for summary judgment will be granted in part and taken under advisement in part,[8] while the motions for summary judgment filed by Stroop, Kline, and Lawson will each be granted.

The Clerk is directed to send certified copies of this order to all counsel of record.

ENTER: This 30ᵗʰ day of March, 2011.

_____
Chief United States District Judge

---

[8] Once the Magistrate Judge has filed his report on Bell's pending motion for sanctions, the court will determine what additional proceedings, if any, will be necessary for consideration of the supervisory liability claim.